**NOT RECOMMENDED FOR FULL-TEXT PUBLICATION**
**File Name: 11a0483n.06**

**No. 09-2617**

**UNITED STATES COURT OF APPEALS**
**FOR THE SIXTH CIRCUIT**

| | | |
|---|---|---|
| DAVID MACDONALD, | ) | |
| | ) | |
| Plaintiff-Appellant, | ) | |
| | ) | |
| v. | ) | On Appeal from the United States |
| | ) | District Court for the Eastern |
| UNITED PARCEL SERVICE, | ) | District of Michigan |
| | ) | |
| Defendant-Appellee. | ) | |

> **FILED**
> ***Jul 14, 2011***
> LEONARD GREEN, Clerk

Before:     KENNEDY, BOGGS, and SUTTON, Circuit Judges.

BOGGS, Circuit Judge. David MacDonald drove trucks for United Parcel Service ("UPS")

for over thirty years. Unfortunately, the relationship between MacDonald and UPS grew sour, and

in early 2007, UPS fired him. MacDonald subsequently sued his former employer, alleging various

theories of discrimination and retaliation. The district court granted summary judgment in favor of

UPS, and MacDonald now appeals. We affirm in part and reverse in part.

I

David MacDonald began working for UPS in 1973, when he was 22 years old. After initially

working on the dock, MacDonald began driving a brown package truck. Around 1980, MacDonald

took a position as a feeder driver and drove tractor trailers from Taylor, Michigan, to the UPS hub

in Grand Rapids. He held that position until his 2007 termination.

As a truck driver, MacDonald's safety record was stellar. In September 2004, MacDonald was given his first of three consecutive annual "Circle of Honor" awards, reserved for UPS drivers with twenty-five years of safe driving. Indeed, in his more than thirty years of driving trucks for UPS, MacDonald never had an accident.

MacDonald's disciplinary record was not quite as impressive, although, in the context of his 34 years at UPS, it is far from troubling. In 1996, MacDonald was issued a written warning for using profanity and refusing to take his break where he was supposed to. In 1997, MacDonald falsified his time card and, later, was warned for driving his feeder truck through a wash tunnel. In 1998, he was warned for failing to wear non-slip shoes. In 2000, he was warned for not knowing his available hours of service, and in 2004, he again used profanity.

In early 2005, MacDonald was involved in an automobile accident that was not work related, and he suffered a closed head injury. As a result of his injuries, MacDonald missed work for nearly three months, from January 30 to April 18, at which time he was cleared by his doctor to resume a normal workload. From this point on, most of the facts are in dispute.

MacDonald testified that, once he returned to work, he informed his supervisor, Jeff Bowen, that he had memory problems as a result of his head injury. UPS does not dispute that it was aware of MacDonald's claimed memory problems, but it suggests that MacDonald was faking those memory problems. Appellee's Br. at 5, 25. Expert testimony supports both positions: MacDonald's treating physicians testified that they diagnosed him with memory problems, and a neuropsychologist examined MacDonald and suggested that he was faking his symptoms.

MacDonald's claimed memory problems are relevant because UPS drivers are routinely tested on safety information, known as the "5 Seeing Habits," which includes a ten-point commentary. Throughout MacDonald's long career at UPS, he took monthly written tests on the safety information and UPS does not dispute that he performed adequately on *these* tests, both before and after his head injury. However, on April 11, 2006, UPS subjected MacDonald—for the first time in his career—to an additional, on-the-spot oral quiz in which he was asked to recite the safety rules from memory. The parties dispute the legitimacy of these spot quizzes, although Bowen testified that most drivers have never been tested this way and that perhaps 25% of UPS's drivers, if so tested, would fail. In addition, another UPS driver swore in an affidavit that, although he had once been given an oral quiz, he had received "all zeros"and there was no follow-up of any kind.

In any case, it is uncontested that MacDonald was unable to recite the rules as requested. MacDonald was subsequently ordered to study the rules while his truck was being loaded in Grand Rapids. This period of time is known as "Central Sort" time and would have otherwise been paid down time. On April 17, MacDonald informed Bowen that, due to lingering effects of his head injury, he was not able to memorize the information. MacDonald also questioned whether the tests were necessary in light of his long history of safe driving, which had continued following his injury. Four days later, UPS terminated MacDonald for failing to recite the safety rules and for reading a newspaper during Central Sort time instead of studying the rules. MacDonald filed a grievance with his union, and the termination was reduced to a suspension, with the union advising MacDonald to cooperate with management in the future.

On September 15, 2006, MacDonald was again asked to recite the safety rules, and he again failed to do so. During the quiz, MacDonald notified UPS that he continued to suffer from memory problems and that he had written documentation from his doctor, dated May 15, 2006, as proof. UPS expressed no interest in the medical documentation. Three days later, MacDonald called Tom Hooper, the Employee Concerns Manager for the corporation, and requested an accommodation: that he be allowed to carry UPS's pocket safety card to use during the oral quizzes. MacDonald testified that he also complained that he was being harassed because of his memory disability, although UPS disputes that MacDonald framed his complaint that way. Later that same day, MacDonald was terminated for failing to recite the safety rules. On September 27, MacDonald filed a grievance, stating that "UPS continues to discriminate, intimidate, harass, coerce, and overly supervise me, with no consideration of my age and physical condition."

During the grievance process, UPS began processing MacDonald's request for an accommodation for his disability. On September 28, a company nurse contacted MacDonald and requested that his doctor complete a medical form detailing his memory problems. On October 5, 2006, MacDonald's physician, Dr. Atto, confirmed that MacDonald had difficulty reciting information under pressure and requested that he be accommodated. On October 16, MacDonald's termination was again rescinded, although UPS informed him that, during his Central Sort time, he would now be required to repeatedly write the safety rules in a notepad. That same day, MacDonald won his third consecutive Circle of Honor award.

On December 6, 2006, Bowen administered another oral safety quiz to MacDonald, and MacDonald failed yet again. The events that followed reflect the level of hostility and distrust

between the parties at this time. Bowen asked MacDonald for the notepad in which he had been told to write the safety rules. MacDonald refused to hand it over. The stalemate ended when, according to MacDonald, Bowen promised to make copies and return the notepad. But, according to Bowen, he promised to return only the copies, keeping the original. Whatever the promise, MacDonald gave Bowen the notebook, and Bowen made copies but did not return the original.

The conflict, however, continued. MacDonald escalated the situation by calling the Taylor police department to report that his property had been stolen. Corporal Walter Howell was dispatched to the UPS facility and spoke with MacDonald, who requested that his personal items be returned to him. Howell also spoke with a UPS supervisor and ultimately concluded that the matter was merely personal in nature. Accordingly, Howell did not create an incident report. Bowen later sent a memo to Pat Gaffney, the feeder-driver supervisor, about the incident and stated that MacDonald was playing games and that, as a result, multiple employees had to waste their time dealing with him. MacDonald made a complaint of his own to Hooper, stating that his manager had stolen his personal property.

Shortly after the notepad incident, UPS began spying on MacDonald. On December 12, 2006, Phillip Siegel, a UPS Security Supervisor, initiated a substantial surveillance effort directed at MacDonald. Seigel testified that, the prior week, after he had returned from vacation, he was asked to monitor MacDonald to ensure that he was making good use of his time, and that Gaffney had told him that he was looking for documentation in order to discipline MacDonald. Siegel personally followed MacDonald and also had cameras installed that could record MacDonald's activities while on the clock. UPS's Security Manager, Robert Pellicer, stated in an affidavit that

he had been asked to conduct surveillance on MacDonald in November 2006, but because Pellicer was not responsible for the Grand Rapids hub, Siegel was eventually assigned to conduct the surveillance.

On December 18, 2006, MacDonald filed two grievances. First, he claimed that UPS management "continues to intimidate, harass, coerce, and overly supervise me" and "does not treat me with dignity and respect and does not give due consideration to my age and physical condition." Second, he alleged that Bowen, under the direction of Gaffney, stole his personal property.

On January 3, 2007, UPS denied MacDonald's request for an accommodation, concluding that "based upon the medical information that we have received, we are unable to conclude that you are eligible for a reasonable accommodation pursuant to the Americans with Disabilities Act."

On January 11, 2007, Bowen and another supervisor, Vern Watson, followed MacDonald while he drove from Taylor to Grand Rapids. They noted that MacDonald entered a convenience store and exited with a soda. They also looked inside the cab of his truck and noted that MacDonald had left his hazardous materials pouch on his dashboard instead of his seat. Before MacDonald resumed his drive, Bowen told him that he was allowed to stop only to use the restroom, and MacDonald replied, "must have been a nice ride in the package car." The import of that statement is disputed. UPS argues that Bowen was "grossly insubordinate" by sarcastically referring to their uncomfortable ride. Appellee's Br. at 13. MacDonald argues that he merely inquired into how comfortable their ride was. Appellant's Br. at 29. Based only on these observations, UPS fired MacDonald on January 19, 2007. MacDonald fiercely disputes whether any of his recorded behavior was in violation of any company policy, and there is certainly evidence to support his position. For

example, several of his coworkers stated in affidavits that they were aware of no rule against purchasing beverages at stops and, indeed, do so frequently. Also, MacDonald testified that his former supervisor explicitly approved the practice of leaving hazmat pouches on the dashboard, and another driver averred that Bowen himself has left the hazmat pouch on the dashboard. UPS, for its part, provided evidence that it had disciplined other employees for, at least in part, making unauthorized stops. After receiving the discharge notice, MacDonald again contacted Hooper, this time in writing, and complained that the discharge was "clearly in retaliation for reporting the incident to the police and also filing a grievance with the union."

MacDonald continued working while his grievance over his latest discharge was pending, and on January 25, 2007, was ordered to ride in a truck with Bowen for training purposes. Exactly what transpired during this ride is hotly disputed. For example, both MacDonald and Bowen assert that they were deliberately struck by the other with a safety vest, and nearly every other incident is equally uncertain. The only third-party witness to any of the events in question was one of MacDonald's coworkers, who stated in an affidavit that he witnessed Bowen harass MacDonald. In any case, Bowen wrote up a memo detailing MacDonald's alleged misbehavior during the drive and sent it to Gaffney. The next day, MacDonald was taken out of service and, on January 29, 2007, was fired—for the last time—for being "grossly insubordinate." Pursuant to the collective bargaining agreement, UPS replaced MacDonald with Gary Vinnay, who was eight-and-a-half years younger than MacDonald.

On April 17, 2007, MacDonald filed a complaint against UPS in Michigan state court and asserted two claims of violations of Michigan's Whistleblowers Protection Act and Michigan's

Persons with Disabilities Act. On May 8, UPS, citing diversity of citizenship, removed the action to the United States District Court for the Eastern District of Michigan. *See* 28 U.S.C. § 1332. On June 23, 2008, MacDonald amended his complaint to add two more state-law claims. The new claims included an allegation of age discrimination under Michigan's Elliott-Larsen Civil Rights Act and allegations of retaliation for having made complaints of age and disability discrimination.

On June 5, 2009, the district court granted summary judgment in favor of UPS on all of MacDonald's claims. The district court first considered MacDonald's age-discrimination claim. The court held that MacDonald had not demonstrated direct evidence of age discrimination and, although he established a *prima facie* case of circumstantial discrimination, he failed to create a genuine issue of material fact that UPS's stated reason for the termination was pretextual. Next, the court considered the disability-discrimination claim and held that MacDonald was not disabled for purposes of the act, nor did UPS perceive him as disabled for purposes of the act. Third, the court considered MacDonald's retaliation claims. The court held that MacDonald's grievances did not constitute protected activity and, in the alternative, that MacDonald failed to establish a causal connection between the activity and UPS's disciplinary action against him. Finally, the court rejected MacDonald's whistleblower claim. The court held that, although MacDonald's call to the police was a protected activity, he failed to show a causal connection between that activity and his termination.

The district court denied MacDonald's motion for reconsideration on December 11, 2009, and MacDonald filed this timely appeal on December 18, 2009. This court has jurisdiction to review the final judgment of the district court. 28 U.S.C. § 1291.

II

This court reviews a district court's grant of summary judgment de novo. *Hamilton v. Gen. Elec. Co.*, 556 F.3d 428, 433 (6th Cir. 2009). Summary judgment is appropriate where, "view[ing] all facts and inferences in the light most favorable to the non-moving party," the evidence in the record shows "that there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law." *Ibid*.; Fed. R. Civ. Proc. 56(c).

III

A

MacDonald alleges age discrimination in violation of Michigan's Elliott-Larsen Civil Rights Act ("ELCRA"), which provides that an employer shall not "discharge, or otherwise discriminate against an individual with respect to employment, compensation, or a term, condition, or privilege of employment, because of . . . age . . . ." MICH. COMP. LAWS § 37.2202(1)(a).

A plaintiff can support a claim of age discrimination either by direct evidence of bias, which MacDonald does not claim to have, or by circumstantial evidence through the *McDonnell Douglas* framework. *Hazle v. Ford Motor Co.*, 628 N.W.2d 515, 520–21 (Mich. 2001); Reply Br. at 20 ("MacDonald is not making a 'direct evidence' argument on his age discrimination claim."); *see McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802–03 (1973).

In order to establish a *prima facie* case of age discrimination, a plaintiff must show that he "was (1) a member of a protected class, (2) subject to an adverse employment action, (3) qualified for the position, and that (4) others, similarly situated and outside the protected class, were unaffected by the employer's adverse conduct." *Town v. Mich. Bell Tel. Co.*, 568 N.W.2d 64, 68

(Mich. 1997). The fourth element has alternatively been described as whether the plaintiff was fired "under circumstances that give rise to an inference of unlawful discrimination," *Lytle v. Malady*, 579 N.W.2d 906, 914 (Mich. 1998), and can be established by demonstrating that the plaintiff was replaced by a younger person, i*d*. at 916.

If the plaintiff establishes a *prima facie* case of discrimination, the burden shifts to the employer to articulate a nondiscriminatory reason for its action, and if the employer does so, the burden shifts back to the plaintiff to demonstrate that the employer's proffered reason is pretextual. *McDonnell Douglas*, 411 U.S. at 802–03. Notably, the plaintiff can defeat an opposing motion for summary judgment only if his evidence of pretext "also raises a triable issue that discriminatory animus was a motivating factor underlying the employer's adverse action. In other words, plaintiff must not merely raise a triable issue that the employer's proffered reason was pretextual, but that it was a pretext for age or sex discrimination." *Lytle*, 579 N.W.2d at 916.

B

On appeal, UPS does not dispute that MacDonald has established the first three elements of a *prima facie* case of age discrimination: he is a member of a protected class, he was fired from his job, and he was qualified for the position. Accordingly, the only element in dispute is whether MacDonald was fired "under circumstances that give rise to an inference of unlawful discrimination." *Id*. at 914.

MacDonald has failed to establish a *prima face* case of age discrimination. At the time MacDonald was discharged, he was 56 years old, and he was replaced by Gary Vinnay, who was nearly 48 at time. Although the eight-and-a-half year age difference certainly qualifies Vinnay as

younger than MacDonald, he is not substantially so, and therefore Vinnay's age does not by itself suggest that a discriminatory animus was involved. *See Lytle v. Malady*, 566 N.W.2d 582, 599 (Mich. 1997) (vacated in part by *Lytle*, 579 N.W.2d 906); *McCarthy v. USA Credit Union*, 2010 WL 2629788, at *6 (Mich. Ct. App. 2010) (unpublished per curiam opinion).

More significantly, Vinnay was not hired by management for the position, but acquired the position pursuant to a collective bargaining agreement. Indeed, Vinnay had already been an employee of UPS for nearly thirty years, and once MacDonald's position became vacant, it was Vinnay's for the taking. Ordinarily, a replacement selected pursuant to a collective bargaining agreement does not give rise to an inference of discrimination. *See Mlinaric v. Parker Hannifin Corp.*, 853 F.2d 927, at *5 (6th Cir. 1988) (unpublished table decision). Here, MacDonald testified that Gaffney inquired into Vinnay's interest in the job before MacDonald was fired, which, viewed in the light most favorable to MacDonald, suggests that UPS knew Vinnay was next in line and fired MacDonald only upon confirming that he would be replaced by a younger worker. However, MacDonald's testimony was that Vinnay had told MacDonald that Gaffney had previously asked Vinnay about his interest in MacDonald's job. This is pure hearsay and is inadmissible for purposes of summary judgment, *Jacklyn v. Schering-Plough Healthcare Prods. Sales Corp.*, 176 F.3d 921, 927 (6th Cir. 1999), and Vinnay's affidavit, which is extremely favorable to MacDonald's position, makes no mention of the alleged inquiry. Accordingly, the fact that MacDonald was replaced by Vinnay, less than nine years his junior, pursuant to the collective bargaining agreement, does not by itself give rise to an inference of unlawful discrimination.

MacDonald points to additional pieces of circumstantial evidence of age discrimination, but this evidence fails to create a genuine issue as to whether he was fired because of his age. For example, MacDonald testified that Bowen told him to "move [his] old ass" during the contentious events of January 25, 2007, but Bowen is only three years younger than MacDonald, so even viewed in the light most favorable to MacDonald, this statement does little for him. MacDonald also testified that various UPS managers made a few stray remarks about his retirement plans, but inquiries into retirement plans do not generally constitute evidence of discrimination, *Heim v. Meadwestvaco Corp.*, 2006 WL 1410857, at *2 (Mich. Ct. App. 2006) (unpublished per curiam opinion), and without additional evidence of age discrimination, they do not do so here. Significantly, although multiple UPS drivers averred that they were treated better than MacDonald, it does not appear from the record that any are significantly younger than MacDonald. Mike Bokatzian, for example, averred that he was treated better than MacDonald, but he had been a UPS employee for 32 years, nearly as long as MacDonald. And Norman Wahla, who also averred that he was treated better than MacDonald, had been employed by UPS for 36 years, even longer than MacDonald. Indeed, all of the affidavits that support MacDonald's general position were filed by coworkers old enough to have worked at UPS for more than 30 years, indicating that, although MacDonald was treated differently than other workers, it was not because of his age.[1] Accordingly, MacDonald has not created a genuine issue of material fact as to whether he was terminated under

---

[1]Although years at UPS may generally be a bad proxy for age, MacDonald began working at UPS at the age of 22. It is therefore unlikely that a coworker with a similar number of years at UPS could be significantly younger.

circumstances that give rise to an inference of age discrimination, and summary judgment in UPS's favor was proper.

IV

A

MacDonald alleges that UPS violated his rights under the Michigan Persons with Disabilities Civil Rights Act ("PWDCRA"), which provides, in relevant part, that "[t]he opportunity to obtain employment . . . without discrimination because of a disability is guaranteed . . . ." MICH. COMP. LAWS § 37.1102(1). In addition, an employer "shall accommodate a person with a disability for purposes of employment . . . unless the [employer] demonstrates that the accommodation would impose an undue hardship." *Id*. at § 37.1102(2). The analysis of a PWDCRA claim generally parallels that under the Americans with Disabilities Act. *Chmielewski v. Xermac, Inc*., 580 N.W.2d 817, 821 (Mich. 1998).

In order to prove a violation of the PWDCRA, a plaintiff must show that: (1) he is disabled as defined in the act, (2) his disability is unrelated to his ability to perform the job duties, and (3) he has been discriminated against as defined in the statute. *Peden v. City of Detroit*, 680 N.W.2d 857, 863 (Mich. 2004). As defined in the act, a disability is a "determinable physical or mental characteristic of an individual, which may result from . . . injury, . . . if the characteristic . . . substantially limits 1 or more of the major life activities of that individual." MICH. COMP. LAWS § 37.1103(d)(i)(A). Alternatively, a plaintiff can demonstrate a disability for purposes of the act if he can show that he is "regarded as having a determinable physical or mental characteristic" as described in the act. *Id*. at § 37.1103(d)(iii).

Without direct evidence of disability discrimination, a claim under PWDCRA is subject to the same *McDonnell Douglas* burden-shifting framework as MacDonald's claim under ELCRA. *Peden*, 680 N.W.2d at 864.

B

Primarily at issue on this claim is whether MacDonald has created a genuine issue of material fact as to whether he satisfies PWDCRA's definition of a disability. The district court held that he has not, and we agree. Although MacDonald can demonstrate that his memory problem is a "determinable . . . mental characteristic" that was caused by an injury, he must also show that the characteristic "substantially limits" one of his "major life activities." MICH. COMP. LAWS § 37.1103(d)(i)(A). Because he cannot do so, he fails to establish that he is disabled pursuant to PWDCRA and summary judgment was proper.

The first issue is whether "thinking" constitutes a major life activity. There are no PWDCRA cases on this point, but relevant ADA cases highlight the issue. In 2008, Congress amended the ADA to explicitly include "thinking" as a major life activity, but that amendment does not speak to this case, where all of the relevant conduct occurred by January 2007. *Verhoff v. Time Warner Cable, Inc.*, 299 F. App'x 488, 493–94 (6th Cir. 2008). Under the pre-amended ADA in effect during the relevant time period here, this court held, albeit in an unpublished disposition, that thinking is *not* a major life activity. *Hill v. Metro. Gov't of Nashville*, 54 F. App'x 199, 201 (6th Cir. 2002). Also in an unpublished disposition, this court held that "concentrating" is not a major life activity. *Boerst v. Gen. Mills Operations, Inc.*, 25 F. App'x 403, 406 (6th Cir. 2002). Those holdings were questioned in a later unpublished opinion that assumed, without holding, that thinking

*is* a major life activity. *Verhoff*, 299 F. App'x at 493 ("[I]t seems a bit bizarre to flatly say that thinking—the very activity that makes us human—is not 'major' enough."). In addition, other circuits have held in published opinions that thinking is a major life activity under the pre-amended ADA. *Head v. Glacier Nw. Inc.*, 413 F.3d 1053, 1061 (9th Cir. 2005); *Taylor v. Phoenixville Sch. Dist.*, 184 F.3d 296, 307 (3d Cir. 1999).

We need not resolve the dispute as to whether thinking is a major life activity under PWDCRA or the pre-amended ADA because, even if it is, MacDonald has not created a genuine issue of material fact as to whether his memory problem substantially limited his thinking. Michigan courts have looked to the ADA regulations for guidance as to the meaning of "substantially limited" for purposed of PWDCRA. *Klimkowski v. Wayne Cnty.*, 1998 WL 1988424, at *4 (Mich. Ct. App. 1998) (unpublished per curiam opinion). The ADA regulations explain that "substantially limited" means that an individual is "[u]nable to perform a major life activity that the average person in the general population can perform; or . . . [is s]ignificantly restricted as to the condition, manner or duration under which an individual can perform a particular life activity as compared to the condition, manner, or duration under which the average person in the general population can perform that same major life activity." 29 C.F.R. § 1630.2(j).

MacDonald's evidence of his disability is insufficient to create a genuine issue of material fact as to whether he meets this definition of "substantially limited." First, MacDonald points to testimony by his wife, daughter, and doctor that he was unable to recite the UPS safety information from memory. But MacDonald concedes that 25% of UPS drivers would not be able to recite the safety information, and, in any case, his ability to perform a discrete memorization task is but a small

component of his major life activity of "thinking." *See Singh v. George Washington Univ. Sch. of Med. and Health Scis.*, 508 F.3d 1097, 1104 (D.C. Cir. 2007) (holding that test-taking is not a major life activity, but is rather a component of one, and the "limitation [must be] substantial from the perspective of the major life activity as a whole"). In addition, MacDonald's family testified that he routinely forgot to do things such as run errands, let the dog back inside the house, and put the garbage out on garbage day. MacDonald also needed to be reminded about family events such as birthdays and anniversaries, and in order to remember to take his daily medications, he needs to use a system where the medicine containers are aligned in a certain way. These unremarkable lapses in memory differ neither in kind nor in magnitude from those affecting the average person. *See E.E.O.C. v. Sara Lee Corp.*, 237 F.3d 349, 353 (4th Cir. 2001) (holding that examples of forgetfulness suffered by many other adults, including forgetting to take medications, "do not rise to the level of a substantial limitation"). Indeed, MacDonald's own doctor testified that his memory problems were mild in nature. Further, the question is not whether MacDonald is substantially limited only in his ability to memorize, but whether his memory problems substantially limit his ability to think, taken as a whole. MacDonald fails to create a genuine issue of material fact as to this point. Accordingly, MacDonald's PWDCRA claim fails at the summary judgment stage.

In the alternative, MacDonald argues that there is sufficient evidence for a jury to find that UPS regarded him as disabled. We hold otherwise. In order to show that UPS regarded him as disabled, MacDonald must show that UPS knew about his impairment and believed that his impairment significantly impacted a major life activity. *Chiles v. Mach. Shop, Inc.*, 606 N.W.2d 398, 406–07 (Mich. Ct. App. 1999). UPS does not dispute that it knew about MacDonald's inability to

memorize the safety information, but MacDonald must go further and demonstrate that UPS believed that MacDonald was substantially impaired in his ability to think, and he fails to do so. There is no evidence that MacDonald ever told UPS that he had problems with memory other than reciting the safety information on the spot, and indeed, MacDonald testified that he did not tell anyone at UPS management about these problems. Nor did the note from MacDonald's physician inform UPS as to any substantial impairments, stating only that "Mr. Macdonald [sic] is experiencing some problems with short term memory following his closed head injury in January 2005." UPS also allowed MacDonald to continue driving trucks after it became aware of his memory problems, strongly suggesting that it did not perceive him as substantially impaired in his ability to think.

MacDonald argues that, pursuant to this court's decision in *Ross v. Campbell Soup Co.*, evidence of a pretextual reason for an adverse employment action can support an inference that the employer considered the employee disabled. 237 F.3d 701, 708 (6th Cir. 2001). Although MacDonald is correct that there is substantial evidence that UPS's proffered reasons for firing him were pretextual, there is no evidence that the pretext was on account of UPS's belief that he had a disability. In *Ross*, the plaintiff had told the employer that he was disabled within the meaning of the act, and the employer ultimately fired the plaintiff because he was not qualified for the position, which itself could be related to his impairments. *Id*. at 707–08. Taking these pieces of evidence together, the *Ross* court held that there was a genuine issue of material fact as to whether the employer thought that the plaintiff was disabled. Here, there is no evidence that UPS was told that MacDonald was disabled for purposes of the act, and its proffered reason for firing him was that he was grossly insubordinate, which does not raise a suspicion of discrimination based on disability.

*Ross*, then, does not control this case. If pretext in and of itself could prove knowledge of a disability, then it could also prove knowledge of any other improper motive, allowing a plaintiff to succeed on *any* discrimination claim without a shred evidence of a particular type of discrimination. We do not read *Ross* to go that far. In this case, MacDonald's evidence of pretext does not constitute evidence that UPS believed that he was disabled. MacDonald also points to a district court opinion in which the court held that, in a different case, UPS regarded an employee as disabled. *Dunning v. United Parcel Serv.*, 471 F. Supp. 2d 795, 808–09 (E.D. Mich. 2007). But, the name of the defendant aside, that case does not resemble this one in any meaningful way. In *Dunning*, there was significant evidence that UPS believed that the plaintiff was substantially limited in his ability to perform a variety of core functions. *Ibid*. There is no similar evidence here, and MacDonald's "regarded as" argument fails.

V

A

MacDonald alleges claims under the anti-retaliation provisions of both ELCRA and PWDCRA. ELCRA provides that "a person shall not . . . [r]etaliate or discriminate against a person because the person has opposed a violation of this act, or because the person has made a charge, filed a complaint, testified, assisted, or participated in an investigation, proceeding, or hearing under this act." MICH. COMP. LAWS § 37.2701(a). PWDCRA includes a materially identical provision. *Id.* at § 37.1602(a).

In order to establish a *prima facie* case of retaliation under either statute, a plaintiff must show that: (1) he engaged in protected activity (2) that was known by the defendant, and (3) the

defendant took an adverse employment action against him, and (4) his protected activity was a "significant factor" for the employer's adverse action. *Aho v. Dep't of Corr.*, 688 N.W.2d 104, 108 (Mich. Ct. App. 2004); *Barrett v. Kirtland Cmty. Coll.*, 628 N.W.2d 63, 70 (Mich. Ct. App. 2001). Protected activity includes charging a violation of the act, and although the charge need not cite the statute at issue, it "must clearly convey to an objective employer that the employee is raising the specter of a claim of unlawful discrimination" under the statute. *Barrett*, 628 N.W.2d at 72. In contrast, a request for an accommodation under PWDCRA is not protected activity for purposes of stating a claim for retaliation because it does not charge a violation. *Bachman v. Swan Harbour Assocs.*, 653 N.W.2d 415, 437–38 (Mich. Ct. App. 2002).[2] Notably, a retaliation claim under PWDCRA does not require that the underlying charge have merit, but only that the charge be made. *Bryson v. Regis Corp.*, 498 F.3d 561, 577 (6th Cir. 2007).

Once a plaintiff establishes a prima facie case of retaliation, the familiar *McDonnell Douglas* burden-shifting framework is employed. *Aho*, 688 N.W.2d at 109.

B

There is no dispute that MacDonald has demonstrated the second and third elements of his *prima facie* case: UPS knew about his complaints and took an adverse action against him. The

---

[2]MacDonald argues to the contrary, but cites no authority that calls into question the clear holding of *Bachman*. In *Gembus v. MetroHealth System*, for example, this court assumed that a request for an accommodation was protected activity for purposes of Ohio law where the parties did not dispute the issue. 290 F. App'x 842, 847 (6th Cir. 2008). MacDonald also cites two district court opinions that held that a request for an accommodation is protected activity for a retaliation claim made pursuant to Ohio law or the ADA. Appellant's Br. at 41. Significantly, MacDonald cites no authority that contradicts *Bachman*'s holding that a request for an accommodation is not protected activity for purposes of a retaliation claim pursuant to PWDCRA.

remaining, disputed elements are whether MacDonald's complaints constituted protected activity and whether there was a causal connection between that activity and UPS's action. The district court held that MacDonald failed to create a genuine issue of material fact as to either element. We disagree and reverse the district court's grant of summary judgment in favor of UPS.

MacDonald points to the following as evidence of his protected activity. On September 18, 2006, he called Hooper and, viewing Hooper's deposition testimony in the light most favorable to MacDonald, complained that his managers were harassing him because of his disability. Specifically, Hooper testified that MacDonald told him that he was being harassed and that his supervisors "were giving him a hard time with respect to his disability." That same day, MacDonald requested an accommodation and stated that he has a disability. On September 27, 2006, MacDonald filed a grievance that alleged that "UPS continues to discriminate . . . with no consideration of my age and physical condition." On December 18, 2006, MacDonald filed a grievance alleging that "UPS management continues to intimidate, harass, coerce, and overly supervise me . . . and does not give due consideration to my age and physical condition," and also "disregard[s]" his "rights as a human being." Finally, on January 22, 2007, MacDonald sent a letter to Hooper that accused UPS of retaliating against him for calling the police and filing a grievance related to the notebook incident and requested that UPS do something to stop "this on-going harassment and discrimination."

The district court held that MacDonald's grievances did not constitute protected activity because they did not allege that MacDonald was treated differently because of his age and disability, but rather that he should have been treated differently and was not. This takes too narrow a view both of MacDonald's actions and what is required by the relevant statutes. Viewed in the best light

- 20 -

to MacDonald, his September 18, 2006, call to Hooper alleged mistreatment *because of his disability*, and this clearly constitutes protected activity. *See* Mich. Comp. Laws § 37.1102(1). In addition, MacDonald's September 27, 2006, grievance reasonably alleges a claim under PWDCRA, which not only prohibits different treatment because of a disability, but sometimes requires accommodations because of a disability. *Id*. at §37.1102(2). MacDonald had requested an accommodation for his disability just over a week prior to filing the grievance, so his accusation that UPS discriminated against him "with no consideration of my . . . physical condition" can be read to charge a violation of PWDCRA, and it therefore constitutes protected activity. *Ison v. Lakeland Reg'l Health Sys*., 149 F.3d 1183, 1998 WL 344033, at *2, *4 (6th Cir. 1998) (unpublished table decision). Similarly, the December 18, 2006, grievance can be read to charge a violation of PWDCRA's reasonable-accommodation requirement. MacDonald's September 18, 2006, request for an accommodation does not on its own constitute protected activity, and MacDonald's January 22, 2007, letter to Hooper makes no reference to any conduct that could potentially violate either ELCRA or PWDCRA and similarly does not constitute protected activity. *See Mitan v. Neiman Marcus*, 613 N.W.2d 415, 416 (Mich. Ct. App. 2000). Still, MacDonald has created a genuine issue of material fact as to whether he engaged in protected activity on September 18, September 27, and December 18, 2006.

The remaining issue is whether MacDonald has established a genuine issue of material fact as to whether MacDonald's protected activities were a significant factor in UPS's decision to take action against him. Although, as the district court noted, MacDonald must show more than a

temporal connection between his protected conduct and the adverse action, he has done so here. *West v. Gen. Motors Corp.*, 665 N.W.2d 468, 473 (Mich. 2003).

Viewed in the light most favorable to MacDonald, the record demonstrates a genuine issue of material fact as to causation and pretext. In that light, the facts and reasonable inferences are as follows. MacDonald engaged in protected activity on September 18, 2006, and was fired the same day. He returned to work on October 16, 2006, and was immediately required to write the safety rules over and over again in a notebook while his coworkers had down time. Viewed in the light most favorable to MacDonald, this requirement was punitive. Although Bowen testified that the requirement was to help MacDonald remember the rules, he also testified that no employee had ever been made to do it before, he did not know if it would be helpful, and he knew that MacDonald was embarrassed by the requirement. Further, within as little as two weeks, UPS ordered that surveillance be conducted on MacDonald, with the goal of disciplining him, and as soon as the security supervisor was available, MacDonald was subject to extreme scrutiny in the form of hidden surveillance cameras and tails. MacDonald again engaged in protected activity on December 18, 2006. Three weeks later, MacDonald was tailed by two supervisors, who looked for and documented the most miniscule of infractions, which were not enforced against other drivers. UPS terminated MacDonald for those infractions the following week, and a week later, MacDonald was sent on a training ride with a supervisor, who fabricated a story of gross insubordination. The following day, MacDonald was removed from service.

From this sequence of events, a reasonable jury could conclude both that MacDonald was fired because he engaged in protected activity and—much more easily—that UPS's proffered reasons

for firing MacDonald were pretextual. MacDonald was fired the very day he engaged in protected activity. Although the general rule is that temporal proximity is insufficient to raise an inference of causation, in cases where the temporal proximately is unusually suggestive, it can raise such an inference. *Mickey v. Zeidler Tool & Die Co.*, 516 F.3d 516, 524–25 (6th Cir. 2008) (inferring a causal connection where employer took action the same day it learned of protected activity). In any case, it is not the initial termination that MacDonald challenges, but the ultimate one in January, and even if the temporal proximity is by itself insufficient to establish causation for the September termination, it surely constitutes some evidence of UPS's retaliatory mindset for purposes of deciding the issue of causation for the January termination. Further, shortly after returning to work, MacDonald was subjected to heightened scrutiny, a factor that this court has held can establish a causal connection for purposes of a retaliation claim. *Hamilton*, 556 F.3d at 435. Although MacDonald was not put under surveillance until early December, UPS took steps to initiate the surveillance—which MacDonald had never been subjected to before—as little as two weeks after his return. *See id.* at 436 ("The fact that the scrutiny *increased* is critical."); *Upshaw v. Ford Motor Co.*, 576 F.3d 576, 581, 588–89 (6th Cir. 2009) (holding that, where employer took steps to initiate heightened scrutiny shortly after the employee engaged in protected activity but did not actually engage in heightened scrutiny until over a month later, a genuine issue of material fact existed as to causation for a retaliation claim). Accordingly, summary judgment in favor of UPS on the retaliation claim was improper.

VI

A

MacDonald asserts an action under Michigan's WPA, which provides that "[a]n employer shall not discharge, threaten, or otherwise discriminate against an employee . . . because the employee . . . reports . . . a violation or a suspected violation of a law or regulation . . . ." MICH. COMP. LAWS. § 15.362. A plaintiff must establish a prima facie case under the WPA by showing that he (1) was engaged in protected activity, (2) was discharged, and (3) a causal connection exists between the two. *Shallal v. Catholic Soc. Servs. of Wayne Cnty*., 566 N.W.2d 571, 574 (Mich. 1997). In *Shallal*, the Michigan Supreme Court held that, in order to recover under the WPA, the plaintiff must have pursued "an altruistic motive of protecting the public." *Id*. at 579. In that case, the employee threatened to blow the whistle against her employer in order to retain her job, and the court held that, because she had an extortive motive, "no reasonable juror could conclude that plaintiff threatened to report [her employer] out of an altruistic motive of protecting the public," and that "the Michigan Legislature [did not] intend[] the Whistleblowers Act to be used as an offensive weapon by disgruntled employees." *Ibid*. The district court noted that, in *Phinney v. Perlmutter*, the Michigan Court of Appeals allowed a WPA claim to proceed that was premised on an allegation of larceny that was made for personal gain, but that case was decided before *Shallal*. 564 N.W.2d 532, 555 (Mich. Ct. App. 1997). More significantly, there is no indication that the *Phinney* plaintiff reported her employer because she was vindictive or disgruntled as opposed to having a genuine belief that a violation had occurred. *Id*. at 554–55.

B

MacDonald fails to create a genuine issue of material fact that he acted out of a good-faith desire to protect the public, as opposed to out of personal vindictiveness, and pursuant to *Shallal*, he is precluded from recovering under the WPA. Here, it is not disputed that MacDonald called the Taylor Police Department for the sole purpose of retrieving his notepad, and not to protect the public. Defendants argue that MacDonald's personal interest is alone sufficient to kill his WPA claim, but the appropriate question is not simply whether MacDonald's actions furthered his personal interests, but whether he acted in bad faith. *See Shallal*, 566 N.W.2d at 579; *Edward v. W. Branch-Rose City Area Schs.*, 2002 WL 1998558 (Mich. Ct. App. 2002) (unpublished per curiam decision). Here, MacDonald chose to call the police to escalate a minor spat over whether he should be able to keep his handwritten copies of the UPS safety rules, as opposed to photocopies of his handwritten copies of the UPS safety rules, which he was in fact given. It is undisputed that MacDonald had been notified in writing that he was required to submit to UPS his written work each day, and that this work would be kept on file by UPS. Under these circumstances, no reasonable juror could conclude that MacDonald acted under a good-faith belief that a criminal violation had occurred, and he therefore cannot recover under the WPA.

The officer sent to the scene had no difficulty seeing the situation for what it was: not a legitimate public concern, but rather a wholly unnecessary escalation of a petty personal dispute. In his affidavit, Corporal Howell explained:

> Mr. MacDonald told me that a supervisor had stolen some papers from him that were, according to Mr. Macdonald, his personal property. Mr. MacDonald stated that he

> wanted his personal items returned to him. He did not want any other kind of relief.
>
> Based on my discussion with Mr. MacDonald and the others present, I concluded that the alleged incident was not a police matter, but instead a private matter between the individuals in question. I told Mr. MacDonald that the dispute between him and UPS was a private matter.
>
> I do not believe that the alleged taking of Mr. MacDonald's papers posed a threat to the public. I also told Mr. MacDonald, based on our discussion, that I believed the papers in question were not actually his personal property, but instead belonged to UPS.
>
> I explained to Mr. MacDonald and the others present that I would not make out an incident report because I believed the alleged incident to be a civil matter. Mr. MacDonald did not argue with me when I said I would not make out an Incident Report.

This third-party summary of the incident reflects the true nature of MacDonald's call: an inappropriate resort to the police by a disgruntled employee, not a good-faith act to stop a criminal violation and protect the public.

In light of the contrary evidence, MacDonald fails to create a genuine issue of material fact as to whether he acted in good faith. In his April 2008 deposition, MacDonald testified that he believed the notes to be "his personal property," but did not state that they contained anything more than the UPS safety rules that he had handwritten pursuant to UPS's request. MacDonald went on to assert that the officer told UPS to return to MacDonald his personal property, but the officer's affidavit asserts the exact opposite: he told MacDonald that the notes belonged to UPS,[3] not to him, and that it was a private matter that he would not get involved in. MacDonald also testified that the

---

[3]There is a genuine issue of material fact as to whether the notepad itself was given to MacDonald by UPS or by his daughter. Either way, it is undisputed that MacDonald was required to handwrite the safety rules and hand in his work to UPS each day.

officer told UPS that he would come back to ensure that they had complied, but this is flatly inconsistent with both the officer's affidavit and the record, which reveals no further contact with the police. In any case, even if MacDonald could create a genuine issue of material fact as to the officer's view of the situation, he fails to create one as to his own motivation.

In his brief, MacDonald argues that the notepad contained notes detailing UPS's harassment, and that these notes were not returned, Appellant's Br. at 21, but the record indicates that this is pure fantasy. When first asked to describe the notepad, MacDonald mentioned only the safety rules. Later the same day, MacDonald testified that he knew he was not given copies of all of the pages in the notepad because the pad contained personal notes that he did not receive, and when asked what those notes were about, he responded that they regarded work that he was doing in his basement. Only when asked *nearly five months later*, in a later deposition, what the notepad had to do with his age-discrimination claim did MacDonald suggest—and only just—that the notes "were written about things that they were doing to me." *Id*. at 440. MacDonald cannot "create a disputed issue of material fact where [his] earlier testimony on that issue . . . indicates that no such dispute exists." *Aerel, S.R.L., v. PCC Airfoils, L.L.C.*, 448 F.3d 899, 907–08 (6th Cir. 2006).

Accordingly, there is insufficient evidence for a jury to conclude that, at the time he made the call to the police, MacDonald was acting under a good-faith belief that Bowen had committed a criminal violation. For this reason, MacDonald is precluded from recovering under the WPA.

VII

For the foregoing reasons, we AFFIRM the district court's grant of summary judgment on MacDonald's disability discrimination, age discrimination, and WPA claims, and REVERSE the

district court's grant of summary judgment on MacDonald's retaliation claim. We therefore

REMAND for further proceedings in accordance with this opinion.