*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

LORRIE SCHAFER,

        Plaintiff-Appellant,

v

MID-MICHIGAN ORTHOPAEDIC INSTITUTE, PLLC,

        Defendant-Appellee.

UNPUBLISHED
February 19, 2019

No. 341972
Ingham Circuit Court
LC No. 16-000838-CD

Before: M. J. KELLY, P.J., and SERVITTO and BOONSTRA, JJ.

PER CURIAM.

Plaintiff appeals by right the trial court's order granting summary disposition in favor of defendant under MCR 2.116(C)(10) (no genuine issue of material fact). We affirm.

## I. PERTINENT FACTS AND PROCEDURAL HISTORY

Plaintiff was diagnosed with breast cancer in May 2008. She had a breast biopsy, a lymph node biopsy, and a surgical procedure to insert a port for chemotherapy, followed by nine months of chemotherapy and nine weeks of radiation. Her cancer then went into remission.

In April 2013, plaintiff was hired by defendant as a medical biller in defendant's East Lansing office. Her duties included posting and accepting money from patients in person, answering the telephone, and working on accounts receivable from insurers and private pay patients. During conversations with the other female employees in the office, including her supervisor, Sandra Hart, plaintiff revealed her history of breast cancer and the fact that she wished eventually to have a mastectomy, which would involve a series of three surgeries.

On or about January 13, 2014, plaintiff had the first surgery. She was off work until February 24, 2014, when she returned to work for four hours per day, three days per week. She returned to work full time in April 2014. On or about August 18, 2014, she underwent the second surgery, and was off work for two weeks before returning full time. On or about December 4, 2014, plaintiff underwent the third surgery for fat grafting, and was off work for three weeks before returning full time.

During 2015, plaintiff continued to suffer pain and associated discomfort, and received sporadic medical treatments and occupational therapy. Eventually, she decided to undergo a fourth surgery to have her breast implants removed because they were irritating her tissue and nerves. She discussed the best date for scheduling this surgery with Ms. Hart, who stated that April 2016 would be the best time.

On or about October 8, 2015, plaintiff was admitted to the hospital for a kidney infection. She was discharged on October 15 and returned to work on October 16. Upon her return, Ms. Hart gave her a memorandum entitled "Attendance Issues, Set Hours and Expectations," which stated in pertinent part:

> RE:     Attendance Issues, Set Hours and Expectations
>
> As you know, we do not have extra staff to fill in when others are absent. Your numerous absences affect all aspects of the business, especially your co-workers. This has become an added burden and must change. Your absences have been ongoing since your hire and your attendance records are going to be reviewed.
>
> Currently you have only one physician's surgical billing to be responsible for. There is no reason that this and your other responsibilities including insurance and patient A/R cannot be accomplished during normal business hours (Monday thru Thursday 8:00 am thru 5:00 pm and Friday 8:00 am thru 2:00 pm).
>
> There is no justification for your presence here other than those prescribed times unless otherwise authorized by either Dr. Sauchak or myself. Working outside of those hours without authorization may result in disciplinary action, up to and including termination of employment.

The memo finished with the following:

> Expected changes from you: 1. Improvement in attendance, 2. Dedicate your first priority to the responsibilities of the Billing Department, 3. Work only the established hours unless approved.
>
> Your overall performance will be reviewed again in 90 days.[1] Improvement and changes are expected in all areas listed above.

Dr. Sauchak, one of four orthopedic surgeons at defendant's clinic and the managing partner at the time, was copied on the memo. According to plaintiff, right after Hart gave her the attendance memo, Hart and other employees began "treating [her] differently" and "nitpick[ing] her work."

---

[1] Plaintiff testified that the performance review, which was supposed to take place after 90 days, did not occur.

After she received this memo, plaintiff briefly talked to Hart about it and Hart told her that if she had any concerns she should see Dr. Sauchak. Plaintiff met with Dr. Sauchak and told him that she always had doctor's excuses for her absences and they were always approved by defendant. She told him that she felt that Hart was harassing her. Dr. Sauchak told her that she did not have to worry about losing her job due to her absences.

On November 12, 2015, Hart wrote Dr. Sauchak a letter describing an interaction that she had with plaintiff on November 10, 2015. The letter stated that plaintiff had taken an extended lunch break and at closing time told Hart that she was going to make up her time by staying late. Hart told plaintiff that she could not do so, given that she had electively taken a long lunch. Plaintiff punched out and left. As Hart was on her way home, plaintiff called her on her cell phone. Plaintiff was upset and afraid that she was going to lose her job. Later that evening, Hart received a text message from plaintiff indicating she wanted to talk with her. The next morning, Hart met with plaintiff. Plaintiff was defensive, claiming that Hart had no right to speak to her in 'that tone' and no right to deny her request to work late. According to the letter, plaintiff told Hart that she had been disrespectful to her, that she feared that her absences were going to cause her to lose her job, that if she were to lose her job due to her absence for an upcoming surgery, she knew her rights under the Americans with Disabilities Act (ADA) and that she had spoken to an attorney. The letter concluded with Hart stating that she and plaintiff had mutually worked out a schedule. Hart testified at her deposition that she drafted the letter because she felt obliged to inform Dr. Sauchak that plaintiff had stated that she had spoken to an attorney. Hart did not recall whether Dr. Sauchak ever spoke to her about the letter.

In the meantime, plaintiff was put on a waiting list for her fourth surgery. On February 23, 2016, she learned that there had been a cancellation and that she would be scheduled for surgery the following day. She underwent the surgery on February 24, remained in the hospital for two days, and was off work until April 18, 2016. On April 30, 2016, plaintiff was diagnosed with strep throat and pinkeye as a result of her weakened immune system. She was off work until May 9, 2016.

Shortly thereafter, an incident occurred that, according to defendant, led to plaintiff's discharge. On May 11, 2016, plaintiff wrote on the attendance board that she would be taking May 13 off. When Hart inquired about that, plaintiff claimed she that had done this as a joke, and that she was not actually going to take May 13 off. The next day, Hart yelled at her about it and, when plaintiff assured her that it was only a joke, said, in front of other employees: "It's not funny. You've missed so much work, and your work is so far behind." Plaintiff subsequently met with Dr. Sauchak and told him that she felt she was being harassed over her absences due to her surgeries. She also complained that in the past Hart had let her make up time after hours but lately would not allow her to do so.

Later in the day, Hart approached plaintiff and asked if she was alright. Plaintiff replied, "Yes, except for the fact that you're harassing me today." Hart informed plaintiff, "I've had complaints you're slurring your words." Plaintiff asked whether she was slurring her words at that moment, and Ms. Hart said that she was not. Plaintiff asked who had said that she was

slurring her words, and Ms. Hart answered that "Laura" and another employee had told her that.[2] Later that day, plaintiff confronted Laura and two other employees, offering to take a blood test to prove that she was not intoxicated.[3] Plaintiff denied yelling, but admitted to being "frustrated" and raising her voice.

Plaintiff later apologized to Laura. She testified that there were no patients left in the office when she confronted the co-workers. After the incident, Heather Trochak, the office manager, sent plaintiff home for the rest of the day. When she left, plaintiff called Dr. Sauchak and again told him that she felt she was being harassed for missing time due to surgeries. Plaintiff testified that she asked Dr. Sauchak if she was going to be fired and whether she needed to contact an attorney, and that he responded "Lorrie, I wish you hadn't said, you know, anything about an attorney. Now I have to contact my attorney." Dr. Sauchak told her that he would have to look into the situation before making a decision as to the next step and that he would call her the next day. Plaintiff then registered a grievance with the Michigan Department of Civil Rights by telephone. When Dr. Sauchak called her the next day (Friday, May 13), she told him that she had filed a grievance to "protect herself" and again said that she felt threatened and harassed.

On May 19, 2016, plaintiff was admitted to the hospital with an infection; she was discharged on May 26, 2016. Within a day after arriving home, a letter addressed to plaintiff from defendant, signed by Dr. Sauchak and dated May 25, 2016, arrived in the mail. In pertinent part it read:

Ms. Schafer:

This letter is to inform you that your employment with Mid-Michigan Orthopaedic Institute, PLLC ('MMOI'), as an at will employee working in medical billing is terminated effective May 25, 2016.

You have failed to adhere to the employee conduct and work rules outlined in the MMOI employee handbook. . . .

On May 11, 2016 and May 12, 2016 you had several angry outbursts, confronted employees in a hostile manner and disrupted the workplace with your behavior (violation of Policy No. 2003, 2029, and 2031). You were sent home early by a supervisor on May 12, 2016. Since that date, it was also discovered that you were conducting personal business on your work email during working hours (violation

---

[2] Plaintiff later found out that Laura had not told Hart that plaintiff was slurring her words. At her deposition, Hart admitted she had mistakenly named Laura as a source of that information.

[3] Plaintiff also sent Dr. Sauchak a text message advising that she had been accused of slurring her words and asking if her words sounded slurred when she spoke to him earlier. In a second text message to Dr. Sauchak that day, plaintiff stated that his and Hart's expectations of her were "against the law" due to her cancer and immune system deficiency.

of Policy No. 2019). For example, you were scheduling a 'shower' at Lansing Quality Suites. This misconduct is unacceptable.

You have not been able to maintain the standards required by MMOI and failed to adhere to the employee conduct and work rules; therefore, your services as a MMOI employee are terminated effective May 25, 2016. As you know, it is clear from your conduct that cause for termination exists.

Dr. Sauchak testified at his deposition that he made the decision to terminate plaintiff's employment after conducting an internal investigation into the May 12, 2016 incident. He testified that his decision to terminate plaintiff was solely due to plaintiff's angry and threatening outburst at the office on May 12, 2016.

Hart testified at her deposition that on May 12, 2016 she received a call from the front desk stating that plaintiff was slurring her words. She and another employee then asked plaintiff if she was alright, and plaintiff said that she was fine. A short time later Hart was told that plaintiff had been confronting other employees, wanting to know who had stated that she was slurring her words. She heard plaintiff confront another employee, and testified that plaintiff was argumentative but that she could not see whether plaintiff was being violent. She also did not know whether plaintiff had threatened anyone. Hart testified that she and another employee went into Trochak's office and locked the door to avoid a confrontation with plaintiff. Hart testified that she was told by other employees that plaintiff went "all through the office" demanding to know who had stated that she had slurred her words. Hart testified that to her knowledge, plaintiff's subsequent termination was based on her outburst and conduct that day.

On October 31, 2016, plaintiff filed a complaint alleging retaliatory discharge under the Persons With Disability Civil Rights Act (PWDCRA or "the Act"), MCL 37.1101 *et seq*. She asserted that she was discharged in retaliation for asserting her rights under the Act to be free from harassment/discrimination due to her disability.

On November 15, 2017, defendant moved for summary disposition under MCR 2.116(C)(8) and (C)(10). After a hearing, the trial court granted the motion, holding in part that plaintiff had not engaged in a "protected activity" under the PWDCRA because plaintiff was not a "disabled" employee. The court stated:

The first element is that the Plaintiff engaged in a protected – protected activity. Well, I don't know how exactly under these facts the Plaintiff could have been engaging in a protected activity without having a disability that Plaintiff was attempting to protect.

The court went on to state:

Under the disability definition in the statute, MCL 37.1103(D), it is specifically an exception to being considered disabled under the statute if your condition is something that interferes with your ability to perform the duties of a particular position. . . . In this case, there is actual missed time. There is a discussion about the missed time. And to the extent that Plaintiff argues that her condition was

-5-

such that she needed to miss time and couldn't do her job, she doesn't fit within the statute to begin with. So she's not a disabled employee. . . . So I'm not sure where the Plaintiff establishes that she – she either has a disability that is protected or if she does, that she meets the elements to establish a prima facie case. That is, that she engaged in protected activity. . . .

The trial court also held that plaintiff had not met her burden of proving a causal connection between her alleged protected activity and her termination, noting that Dr. Sauchak had testified, and the documentary evidence showed, that plaintiff's termination was not based on absenteeism but on the May 12, 2016 incident in which she had confronted other employees.

This appeal followed.

## II. STANDARD OF REVIEW

This Court reviews de novo a trial court's decision on a motion for summary disposition. *Miller v Farm Bureau Mut Ins Co*, 218 Mich App 221, 233; 553 NW2d 371 (1996). When deciding a motion under MCR 2.116(C)(10), a court must consider affidavits, pleadings, depositions, admissions and other documentary evidence submitted by the parties in the light most favorable to the party opposing the motion. *Greene v A P Prods, Ltd*, 475 Mich 502, 507; 717 NW2d 855 (2006). The motion "tests the factual support for the claim and should be granted if there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. *West v General Motors Corp*, 469 Mich 177, 183; 665 NW2d 468 (2003). A genuine issue of material fact exists when the record, giving the benefit of reasonable doubt to the opposing party, leaves open an issue upon which reasonable minds might differ. *Id*.

We review de novo issues of statutory interpretation. *Dep't of Transp v Tomkins*, 481 Mich 184, 190; 749 NW2d 716 (2008).

## III. ANALYSIS

The trial court did not err by granting summary disposition in favor of defendant under MCR 2.116(C)(10), because plaintiff failed to raise a genuine issue of material fact regarding causation. We therefore do not address whether plaintiff was engaged in a protected activity.

The PWDCRA (formerly the Handicappers' Civil Rights Act (HCRA), see *Peden v City of Detroit*, 470 Mich 195, 203; 680 NW2d 857 (2004), prohibits discrimination against individuals because of their handicapped status in the areas of employment, housing, and public accommodations. *Chmielewski v Xermac, Inc,* 457 Mich 593, 601; 580 NW2d 817 (1998). With respect to employment, the purpose of the PWDCRA is to mandate "the employment of the handicapped to the fullest extent reasonably possible." *Id*. MCL 37.1202 provides in pertinent part:

(1) Except as otherwise required by federal law, an employer shall not:

(b) Discharge or otherwise discriminate against an individual with respect to compensation or the terms, conditions, or privileges of employment, because of

-6-

a disability or genetic information that is unrelated to the individual's ability to perform the duties of a particular job or position.

MCL 37.1602(a) governs retaliation, and provides:

A person or 2 or more persons shall not do the following:

(a) Retaliate or discriminate against a person because the person has opposed a violation of this act, or because the person has made a charge, filed a complaint, testified, assisted, or participated in an investigation, proceeding, or hearing under this act. [MCL 37.1602(a).]

A plaintiff bears the initial burden of establishing a prima facie case of retaliatory discharge. *Roulston v Tendercare, Inc,* 239 Mich App 270, 280; 608 NW2d 525 (2000). To establish a prima facie case of retaliation under MCL 37.1602(a), a plaintiff must establish: (1) that he or she engaged in a protected activity, (2) that this was known by the defendant, (3) that the defendant took an employment action adverse to the plaintiff, and (4) that there was a causal connection between the protected activity and the adverse employment action. *Aho v Dep't of Corrections*, 263 Mich App 281, 288-289; 688 NW2d 104 (2004); *DeFlaviis v Lord & Taylor, Inc,* 223 Mich App 432, 436; 566 NW2d 661 (1997).

If the plaintiff establishes a prima facie case, a presumption of retaliation arises, which the defendant can rebut by offering a legitimate, nonretaliatory business reason for the adverse employment action. *Aho*, 263 Mich App at 289. If the defendant provides such a reason, the burden shifts back to the plaintiff to prove that the legitimate reason offered by the defendant was not the true reason but merely a pretext for the adverse employment action. *Id.*[4]

Here, the trial court found that plaintiff had failed to meet her burden of showing both that she was engaged in a protected activity and that her termination was causally connected to that activity. We affirm based on the trial court's finding that plaintiff had not shown a causal connection between any protected activity and her termination.

## A. PROTECTED ACTIVITY

Plaintiff argues that the trial court erred by holding that she was not disabled under the PWDCRA and therefore had not engaged in any protected activity under the Act. The trial court held that plaintiff was not "disabled" within the meaning of the Act, because the PWDCRA definition of disability is a characteristic that is "unrelated to the individual's ability to perform the duties of a particular job or position," see MCL 37.1103, and plaintiff's cancer and immune deficiency had caused her to miss work and be unable to perform her job. In essence, the trial

---

[4] The burden-shifting applies to cases with circumstantial evidence. If direct evidence of discrimination or retaliation exists, the burden-shifting does not occur. *DeBrow v Century 21 Great Lakes, Inc,* 463 Mich 534; 620 NW2d 836 (2001). The instant case involves circumstantial evidence, as plaintiff acknowledges.

court held that plaintiff was required to show that she had a valid claim under the PWDCRA before she could succeed on a claim for retaliatory discharge based on plaintiff's opposition to a violation of the Act.  MCL 37.1602(a).

There is no published authority that directly speaks to whether a valid disability under the PWDCRA is a prerequisite to a claim for retaliatory discharge for opposing a violation of the act. While we have held that a plaintiff is required to show that she is disabled in order to make out a prima facie case for discrimination under the PWDCRA, see *Lown v JJ Eaton Place*, 235 Mich App 721, 727; 598 NW2d 633 (1999), neither this Court or our Supreme Court has held the same for a claim for retaliatory discharge for *opposing* discrimination under the act.  In fact, when discussing the identically-worded antiretaliation provision under the HCRA, this Court stated that " '[r]egardless of the vagueness of the charge or the lack of formal invocation" of the protections of the HCRA, "if an employer's decision to terminate or otherwise adversely effect [sic] an employee is a result of that employee raising the spectre of a discrimination complaint, retaliation prohibited by the act occurs.' "  *Mitan v Neiman Marcus*, 240 Mich App 679, 681; 613 NW2d 415 (2000).  It could be argued that plaintiff's assertion to Dr. Sauchak that she had filed a grievance with the Department of Civil Rights[5] based on discrimination and harassment due to her disability raised such a spectre, even if she would not have prevailed on a claim for discrimination under the PWDCRA.[6]

In any event, we need not, and do not, decide the issue, because the trial court correctly determined that plaintiff had failed to carry her burden with regard to causation.

## B.  CAUSATION

To establish a "causal connection" between the protected activity and the adverse employment action, a plaintiff must demonstrate that his or her participation in the protected activity was a "significant factor" in the employer's adverse employment action, not merely that there was some causal link between the two events.  *Barrett*, 245 Mich App at 315; *Aho,* 263 Mich App at 289.  Mere discriminatory or adverse action will not suffice as evidence of retaliation unless the plaintiff demonstrates a clear nexus between such action and the protected activity.  *Id*., citing *Mitan,* 240 Mich App at 681-682.  Mere temporal proximity is not enough; the plaintiff has to show that the employer took adverse employment action *because of* the plaintiff's protected activity, rather than merely showing that the employer disciplined him or her

---

[5] It appears that plaintiff may not have formally filed her grievance in writing until *after* her termination, although she told Dr. Sauchuk that she had made a telephone call to the Department of Civil Rights concerning such a grievance.

[6] The United States Court Of Appeals for the Sixth Circuit has so held.  See *MacDonald v UPS,* 430 Fed Appx 453, 464 (CA 6, 2011) (applying in part Michigan's PWDCRA) (stating that "a retaliation claim under PWDCRA does not require that the underlying charge [of opposing a violation of the PWDCRA] have merit, but only that the charge be made."  Decisions of lower federal courts are, of course, not binding on this Court.  See *Abela v Gen Motors Corp*, 469 Mich 603, 607; 677 NW2d 325 (2004).

after the protected activity occurred. See *West v General Motors Corp*, 469 Mich 177, 185-187; 665 NW2d 468 (2003).

Here, Dr. Sauchak testified specifically that he terminated plaintiff's employment solely because of the May 12, 2016 incident:

> I know that Lorrie was confronted at the checkout desk initially, and when I say confronted, in a non-threatening manner. I know that she had outbursts that were described to me from multiple people in the office. Some of the adjectives that were used were postal, ballistic, threatening. I know that she was pounding on a door at some point; I believe it was the office manager's door, where two employees were, I guess for lack of a better term, hiding.
>
> . . . . I know that she was disruptive in the front office when patients were checking in. I know that a provider was in the office, Dr. Dunn, specifically seeing patients and it disrupted his office.
>
> After I put this together and got my facts together, and was eventually able to talk to Heather, I made the decision that this was unacceptable behavior, and that this incident directly violated our office policy, was very extreme, and unacceptable. I sought legal counsel, and terminated her employment because of this incident, period.

Plaintiff points to no direct or circumstantial evidence, other than temporal proximity, that her termination was due to her alleged protected activity under the PWDCRA. It is undisputed that her dismissal occurred after she had complained about being harassed and told Dr. Sauchak that she had filed a grievance. Besides this temporal proximity, the only evidence she points to in support of a causal connection is the comment made by Dr. Sauchak when she told him she had contacted an attorney: "I wish you hadn't done that, Lorrie." This does not amount to evidence upon which reasonable minds could differ as to whether plaintiff's termination was caused by her assertion of rights under the Act. *West*, 469 Mich at 183. Other than that isolated and rather innocuous comment by Dr. Sauchak, plaintiff presented no evidence of actions or statements by agents of defendant that suggest a causal connection between any protected activity and her termination. Plaintiff's participation in any protected activity is linked to the subsequent adverse employment action only by "conjecture and speculation." *Aho*, 263 Mich App at 289. Speculation and conjecture are insufficient to create a genuine issue of material fact. *Ghaffari v Turner Constr Co (On Remand)*, 268 Mich App 460, 464; 708 NW2d 448 (2005).

We find plaintiff's citation to *Henry v City of Detroit*, 234 Mich App 405; 594 NW2d 107 (1999), a Whistleblower Protection Act case, unpersuasive. In *Henry*, this Court found that the plaintiff was treated differently after he engaged in his protected activity, including being subject to surveillance by his employer. *Id.* at 408, 414. The plaintiff was also told that his employer was upset with him and believed that his deposition testimony (the protected activity) would "cost the city a lot of money." *Id.* at 414. These additional factors are absent here. Although plaintiff did assert that Hart and others began to "nitpick her work" and treated her differently after Hart gave her a disciplinary letter, this treatment began before plaintiff "raised

the spectre of discrimination" under the Act and could not be causally connected to plaintiff's alleged protected activity. *Mitan*, 240 Mich App at 681. Therefore, the trial court correctly found no genuine issue of fact that plaintiff's alleged protected activity was not a significant factor in defendant's decision to terminate her.

Affirmed.

/s/ Michael J. Kelly
/s/ Deborah A. Servitto
/s/ Mark T. Boonstra